Federal Circuit points out, however, "[t]his is no easy balancing act, . . . since the factors that make an attorney so valuable to a party's prosecution interests are often the very factors that subject him to the risk of inadvertent use or disclosure of proprietary competitive information acquired during litigation." *Id*.

In addition, courts in this district give weight to the expectation that the parties' attorneys will abide by the highest duties and ethical standards that are required of them in general and according to the protective order. *See JAB Distributors, LLC v. London Luxury, LLC*, No. 09-5831, 2010 WL 4008193, at *4 (N.D. Ill. Oct. 13, 2010) (citing *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1211 (Fed. Cir. 1987)). In *JAB*, the court held that the movant's claims that a more restrictive protective order was necessary because its competitor "will spare no effort or expense to usurp the [movant's] business" indicated nothing more than normal competition between the two companies. *JAB*, 2010 WL 4008193, at *2. The court considered the central issue to be whether the protective order "adequately" protected the highly confidential information. *Id*. at *3. The court held that the protective order in place was adequate to ensure the secure production of competitively sensitive information, because the plaintiff's attorneys could view confidential documents and "use them to inform their larger recommendation to their client as to the desirability of a proposed course, without communicating private information contained in those documents (to the clients)." *Id*. at *4.

Similarly, in *Motorola, Inc. v. Lemko Corp.*, No. 08 C 5427, 2010 WL 2179170, at *3 (N.D. Ill. June 1, 2010), a party sought to loosen the protective order's provision that certain "attorneys' eyes only" information would be accessible only to outside counsel of record and to independent expert witnesses and consultants, so that a portion of the protected information would also be

11

available to some of Motorola's in-house attorneys and business or security personnel. *Motorola*, 2010 WL 2179170, at *3. As in *JAB*, the *Motorola* court acknowledged the competition, or potential competition, between the parties, and the parties' concern that disclosure of development, design, and implementation of cutting-edge communications technology "would put the company at risk that a competitor or potential competitor would learn of and use the technology." *Id.* at *4. The court held, however, that the defendants failed to show that disclosure of the materials to a small number of Motorola personnel – the responsibilities of most of whom were legal and security-related – would put the defendants "at any appreciable risk" of "disclosure (including inadvertently or accidentally) of sensitive competitive information," especially in light of the fact that the persons would be subject to the court's protective order and its non-disclosure/non-use restrictions. *Id.*

In this case, the factors in the balancing test weigh against imposing the restriction on Mr. Borsand (and on TT) that defendants seek. Mr. Borsand is TT's lead trial counsel and is intimately involved in TT's overall litigation strategy. As such, TT would face serious difficulty if forced to rely on outside counsel rather than Mr. Borsand to the extent that defendants propose. Defendants' suggestion that Mr. Borsand "would not be precluded from representing [TT] in the litigation (Defs.' Mem. at 14), is disingenuous at best. Defendants do not explain how Mr. Borsand could competently discharge his responsibilities as TT's lead counsel while at the same time being kept wholly in the dark as to significant categories of evidence.

Defendants' alternative suggestion that TT would not be prejudiced if Mr. Borsand could not continue to act as lead counsel (*Id.*) is likewise a non-starter. Mr. Borsand has been TT's lead counsel in litigation involving the patents-in-suit since 2003, and he is now its lead counsel in thirteen suits in this court involving these patents. He has also tried one case involving the patents-

12

in-suit to a successful jury verdict in 2007. The idea that TT would be unscathed if it lost Mr. Borsand's involvement as lead counsel blinks reality, and ignores the weight to be given to a party's choice of what counsel will represent it in major litigation. *See Deutsche Bank*, 605 F.3d at 1380 (court must balance competing interests between potential harm from risk of inadvertent disclosure of confidential information against potential harm from restrictions imposed on patentees' right to have counsel of choice).

On the flip side, we find that the risk of inadvertent disclosure of Highly Confidential information Mr. Borsand receives in the litigation is not great. Mr. Borsand does not himself now engage in patent prosecution or inventive activity and does not make decisions related to product pricing, sales, marketing, design, or development. In his declaration, Mr. Borsand stated that he has abided by the terms of the 2006 Order, and indeed, there is no evidence that he has improperly disclosed the Highly Confidential – Attorneys' Eyes Only material to which he has had access. We agree with the analysis of the courts in *JAB* and *Motorola*, and expect that Mr. Borsand will abide by the protective order as he has in the past.[2] Moreover, while to date Mr. Borsand has elected not to view any materials with the designation Highly Confidential - Patent Prosecution, he warrants that if he did view such materials, he would fully abide by the terms of the protective order (Borsand Decl. at ¶ 10). Specifically, Mr. Borsand warrants that he would not have "Primary Responsibility

---

[2]We are mindful of defendants' argument that conduct by Mr. Borsand that defendants cite in a separate motion to disqualify Mr. Borsand as trial counsel (doc. # 293) also supports barring Mr. Borsand from access to Highly Confidential information. In that motion, defendants contend that one of the defendants retained EIP, a European patent firm, in December 2005 as a consultant to help defendants' outside trial counsel defend against TT's 2005 infringement suit. In July 2010, TT hired EIP to represent TT in prosecuting some of TT's European patent applications. Defendants contend that EIP was privy to its "defense strategy related to TT's patents" and other related work product (doc. # 295: Mem. in Supp. of Mot. to Disqualify at 4). In his declaration, Mr. Borsand attests that he did not violate the 2006 Order through his contacts with EIP, and TT has maintained its relationship with EIP (Borsand Decl. at ¶¶ 14-22). The district judge presiding in this case will decide the factual issues in the motion to disqualify, and we will not limit Mr. Borsand's access to materials based on contested allegations that will be adjudicated by another judge. We will revisit the issue of restrictions on Mr. Borsand if the ruling by the district judge provides good cause to do so.

13

for the Preparation and Prosecution of Patent Applications" as defined in the Protective Order (*Id.* at ¶ 10). That is a credible representation, since the evidence submitted with TT's response to defendants' motion shows that Mr. Borsand does not currently exercise primary responsibility for that activity.

Defendants argue that whether or not Mr. Borsand has "Primary Responsibility for the Preparation and Prosecution of Patent Applications," there is a risk of inadvertent disclosure that should bar Mr. Borsand from having access to Highly Confidential information. This misunderstands the nature of a patent prosecution bar in a protective order. The patent prosecution bar reflects a court's determination of "the degree of protection required" to balance the risk of inadvertent disclosure against the harm to the opposing party from limitations imposed on that party's right to have the counsel of its choice. *Deutsche Bank*, 605 F.3d at 1380. Defendants have not pointed out any case, nor have we found one, where an absolute bar against an attorney's access to a wide range of confidential information in a protective order was held to "reasonably reflect the risk presented by the disclosure of proprietary competitive information." *Id.* at 1381. Rather, a patent prosecution bar in a protective order reflects a balance wherein an attorney agrees to give up a specific scope of activities for the specific duration of the bar in exchange for access to certain confidential information. *Id.* As Judge Moran aptly put it: "It's a choice. . . . [A] party . . . has a choice to say, okay, I am going to use this attorney as part of my litigation team. Or I am going to use this attorney as part of my patent application team. But you can't do both." (TT's Opp'n Br., Ex. B: 3/7/06 Tr. at 6).

Finally, we are not persuaded that the activity that defendants say should bar Mr. Borsand from access to confidential material is activity that was not substantially before Judge Moran when

14

he entered the protective order in 2006. We recognize that Judge Moran entered the order over defendants' strenuous objection. But, neither continuing dissatisfaction with the protective order nor the reassignment of the case to a new judge is good cause to change a protective order provision that has adequately governed the case for four years.

Based on this analysis, we find that it is too great a burden to preclude TT's lead litigator and trial counsel from access to defendants' Highly Confidential material. Accordingly, defendants have not presented "good cause" – in fact, they have not presented any changed evidence or circumstances since the 2006 Order issued – that the protective order should be modified as they have requested.

### III.

The next two modifications sought by defendants seek to broaden the patent prosecution bar in the 2006 Protective Order, which prevents people who gain access in the litigation to documents marked "Highly Confidential - Patent Prosecution" from primary responsibility for prosecuting any patent related to the subject matter of the patents in suit. The 2006 Order stated that in order for the designated in-house attorney to view "Highly Confidential - Patent Prosecution" information, he or she "must, prior to disclosure, elect in writing to forego Primary Responsibility for Preparation and Prosecution of Patent Applications Related to the Subject Matter of the Patents-in-Suit until 1 year after conclusion of the proceedings" (2006 Order at ¶ 8). Defendants seek to expand both the definition of "Primary Responsibility for Preparation and Prosecution of Patent Applications" as well as the definition of "Related to the Subject Matter of the Patents-in-Suit." TT contends that defendants' proposed expansion of both the type and scope of activities to be prohibited by the bar exceeds any risk of disclosure of confidential information.

15

**A.**

The 2006 Order defines "Primary Responsibility for Preparation and Prosecution of Patent Applications" as drafting patent specifications, drawings, claims, or amended patent claims (2006 Order at ¶ 8). The 2006 Order specified that "Primary Responsibility" does not include general advice over patent strategy, patent office interviews, or opposition proceedings in a foreign country (*Id.*). Defendants contend that this definition does not adequately limit the inadvertent risk of disclosure. They seek to expand the definition to include these formerly excluded categories: "the preparation and filing of responses to objections of the patent examiner, interviews at the patent office or by telephone, participating in opposition, reexamination, reissue, appeal or similar proceedings in the U.S. or in a foreign country and generally advising other attorneys of overall patent strategy, and supervising, directing or instructing others engaged in any of the foregoing activities" (Proposed Order at ¶ 8).

The Federal Circuit, however, has held that there is little risk of inadvertent disclosure involved in the activities to which defendants seek to expand the bar: "reporting office actions or filing ancillary paperwork, such as sequence listings, formal drawings, or information disclosure statements;" and "high-altitude oversight of patent prosecution, such as staffing projects or coordinating client meetings." *Deutsche Bank*, 605 F.3d at 1379-80. Without any evidence to justify expanding the patent prosecution bar to situations which the Federal Circuit has stated present a low risk of inadvertent disclosure, or evidence as to why the present definition has proven insufficient, we deny defendants' motion to expand the definition of "Primary Responsibility for Preparation and Prosecution of Patent Applications."

16

**B.**

We likewise deny defendants' proposed expansion of the definition of "Related to Subject Matter of Patents-In-Suit." The 2006 Order defines "Related to Subject Matter of Patents-In-Suit" as "patent applications seeking to claim a graphical user interface for manual order entry" (2006 Order at ¶ 8). Defendants contend that this definition does not adequately limit the inadvertent risk of disclosure because the technology embodied in their products "clearly has relevance and application beyond merely a 'graphical user interface for manual order entry'" (Defs.' Mem. at 8). Defendants propose that "Related to the Subject Matter of the Patents-In-Suit" should mean "patent applications seeking to claim subject matter related to the electronic trading of commodities" (Proposed Order at ¶ 8). In support, they argue that TT has propounded discovery requests seeking confidential technical information going far beyond the confines of a "graphical user interface for manual order entry" (doc. # 307: Defs.' Reply at 10-11). In addition, defendants note that the '132 and '304 Patents state that the invention "is directed to the electronic trading of commodities" (*Id.* at 11).

By contrast, TT argues that the same considerations apply now as applied when Judge Moran considered and rejected defendants' arguments to broaden the subject matter of the bar in 2005 (TT's Opp'n Br. at 15). TT contends that "graphical user interfaces for manual order entry" "accurately describes the subject matter of the patents-in-suit" (*Id.*). TT argues that defining the subject matter broadly as "directed to electronic trading of commodities" would "mean that any attorney who accessed information in the third tier[3] would be barred from electronic trading fields wholly

---

[3]The "third tier" as used by TT appears to refer to information designated "Highly Confidential - Patent Prosecution" under the protective order.

unrelated to the pending litigation, such as algorithmic trading, back end architecture, matching engines, etc. – essentially TT's entire patent application portfolio" (*Id.* at 15-16). As such, TT argues that defendants' proposed definition does not "reasonably reflect the risk presented by the disclosure of proprietary competitive information" (*Id.* at 16 (quoting *Deutsche Bank*, 605 F.3d at 1381)).

We find that TT has the better of this debate. While defendants point to some language describing the '304 and '132 Patents in broad terms, a closer examination of those patents reveals that almost every section of the patents-in-suit specify that the patents read on a specific tool for executing trades more quickly and efficiently, not on the electronic trading field as a whole (*see* doc. #1: Compl., Ex. A: '304 Patent; Compl., Ex. B: '132 Patent). Moreover, defendants' argument that the breadth of TT's discovery requests warrants a broadened definition of the subject matter of the patents-in-suit is a recycled argument that Judge Moran previously considered and rejected.

During the proceedings in 2006, as here, defendants argued for a broad definition of the scope of the patent bar, in part, based on discovery requests by TT that seek confidential technical information that was broader than a "graphical user interface for manual order entry" (Defs.' Reply at 10-11). At a March 10, 2006, hearing before Judge Moran, Mr. Borsand argued for a narrow definition of the subject matter – patents seeking to claim a graphical user interface for electronic order entry – while defendants' counsel argued that the discovery propounded was "exceedingly broad" and went beyond graphical interface to all electronic trading tools and even banking as a whole (doc. # 299: 3/10/06 Tr. at 34-37). Judge Moran reiterated that the protective order "applies only to the technology involved in this lawsuit," and "that we go back to the general obligation . . . [that] highly confidential information . . . cannot be used except for the purposes of this lawsuit" (*Id.* at 35-36).

18

On July 6, 2006, Judge Moran ordered the parties to file a "blueprint of the current disputes regarding the protective order with the Court" (doc. # 117: 7/6/06 Order). Defendants' "blueprint," filed in the eSpeed case, indicated that they sought a protective order which defined "Related to the Subject Matter of the Patents-in-Suit" as "related to the electronic trading of commodities" (eSpeed doc. # 365: Defs.' Blueprint, Ex. B at 7). By contrast, TT sought to define the phrase as meaning "patent applications seeking to claim a graphical user interface for manual order entry" (*Id.* at 6). These are the same definitions the parties seek now, almost five years later. In addition, defendants' arguments in support of a broader definition of "related to the subject matter of the patents-in-suit" were largely the same before Judge Moran as they are today. In their blueprint, defendants summarized their argument in favor of an expansive definition as follows:

> TT's ever expanding patent application filings cover subject matter that extends to data processing systems for use in electronic trading, managing data displays, graphic user interfaces, as well as systems and methods for executing electronic trades. Additionally, it is possible that their currently unpublished pending applications cover even more areas of electronic trading. All of TTI's applications and patents clearly include more than graphic user interfaces and additionally all of the pending applications could be influenced by Highly Confidential-Patent Prosecution material that is disclosed during litigation, which by no means is limited to graphic user interfaces. Thus, it is illogical to restrict the subject matter of the patents-in-suit to graphic user interfaces; instead, the related subject matter is electronic trading of commodities.

(eSpeed doc. # 365: Defs.' Blueprint, Ex. C at 6).

Judge Moran rejected defendants' arguments. In his memorandum opinion accompanying the 2006 Order, Judge Moran stated that he had considered defendants' "blueprint," and determined that "the obligations should be confined to patent applications seeking to claim a graphical user interface for manual order entry" (doc. # 120: 7/13/06 Mem. Op. and Order at 3-4). Judge Moran reasoned that "[t]he likelihood of inadvertent use of restricted information by a litigator, when the

19

information relates to patents that are largely irrelevant to the litigation, is small, indeed" (*Id.* at 4). Judge Moran held that the protective order would apply to all of the related TT cases (*Id.* at 5).

Defendants have not demonstrated good cause to diverge from Judge Moran's reasoning, which we find persuasive. We reiterate: dissatisfaction with a prior ruling or assignment of the case to a new judge do not constitute good cause to rewrite a protective order. Accordingly, we reject defendants' request to modify the 2006 Order to expand the definition of "Related to Subject Matter of Patents-in-Suit."

## IV.

Lastly, defendants seek to expand the protections afforded to "source code" material in the protective order. Defendants propose a fourth category of confidentiality, entitled "Highly Confidential-Attorneys' Eyes Only-Source Code" for Highly Confidential-Attorneys' Eyes Only material that consists of source code (Proposed Order at ¶ 4). In addition to the heightened confidentiality to which the Attorneys' Eyes Only material would be subject, source code material would be subject to additional, extensive procedures involving the establishment of a secure facility in which source code can be deposited by the producing party and reviewed by the requesting party under elaborate restrictions (Proposed Order at ¶ 9; Defs.' Mem. at 15).

Defendants contend that when the 2006 Order was entered, TT had requested production of source code from older products that defendants were relying on as prior art but not actively marketing, while now, by contrast, TT is requesting source code from defendants' currently accused infringing products (Defs.' Mem. at 9). In addition, defendants contend that since the 2006 Order was entered, the marketplace has become more competitive, and TT's activity in it has increased (Defs.' Reply at 12).

TT counters that defendants knew of their intention to seek discovery of current source code and that TT had requested production of source code and object code for operative and current versions of the allegedly infringing products before entry of the 2006 Order (TT's Opp'n Br. at 17-18). Furthermore, TT claims that it has already produced source code under the 2006 Order, and that defendants' addition of a five-page procedure on how to deal with source code is "unnecessarily burdensome and would just serve to multiply costs for all parties" (*Id.* at 18). Finally, TT contends that defendants' source code is already adequately protected by the 2006 Order (*Id.*). TT notes that parties in related cases have already produced source code under the 2006 Order without problems (*Id.* at 19).

In a recent case in this district, the court denied a party's request to enhance confidentiality restrictions for source code material. In *Bergstrom, Inc. v. Glacier Bay, Inc.*, No. 08 C 50078, 2010 WL 257253 (N.D. Ill. Jan. 22, 2010), the court found that the enhanced procedures requested, including requiring the party to view the material on a computer in a specific location, was extremely time consuming and "overly burdensome," and that the movant had not made a sufficient showing that the circumstances regarding the source code – including its highly sensitive nature – justified such a restrictive viewing. *Id.* at *2. Although in *Bergstrom*, the court barred an attorney from viewing the source code who was involved in the litigation and in prosecuting related patents, *id.*, in the instant case, as has been established above, Mr. Borsand is not involved in prosecuting related patents, and the risk of inadvertent disclosure by Mr. Borsand is low.

Defendants have failed to show that the kind of labyrinthian procedures they propose for handling source code are needed here. Accordingly, we deny defendants' motion to amend the source code provisions in the 2006 Order.

21

## CONCLUSION

For the foregoing reasons, we deny defendants' motion to modify the protective order (doc. # 284).

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: January 18, 2011**

22