IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRADING TECHNOLOGIES INTERNATIONAL, INC. <br><br> Plaintiff, <br><br> vs. <br><br> GL CONSULTANTS, INC., *et al.* <br><br> Defendants. | Civil Action Nos. 05-4120, 05 C 5164 <br><br> Magistrate Judge Sidney I. Schenkier |
| TRADING TECHNOLOGIES INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> FUTUREPATH TRADING, LLC, <br><br> Defendant. | |

## MEMORANDUM OPINION AND ORDER

Defendants, GL Trade SA, GL Trade Americas, Inc., SunGard Data Systems, Inc., SunGard Investment Ventures LLC, and FuturePath Trading LLC, have moved this Court to compel the production of documents withheld under the attorney-client privilege ("privilege") by non-party Richard Friesen (doc. # 725). For the reasons that follow, the motion is granted in part and denied in part.

**I.**

The defendants in this long-running litigation have sought the production of multiple documents from Mr. Friesen, who is not a party to this dispute. In June 2006, defendants served a subpoena from the District Court for the Northern District of California upon Mr. Friesen to produce

a broad range of documents (Defs.' Mot., Ex. L). The subpoena sought materials relating to one of Mr. Friesen's patents and to several of his patent applications, including the item at issue here: U.S. Patent Application Serial No. 09/289,550 (the "'550 application") (*Id.*). Initially, Mr. Friesen did not produce any of the requested items, citing a variety of grounds – most prominently that they were protected by the attorney-client privilege (Defs.' Mot., Ex. M; doc. # 734; Pl.'s Opp., Ex. 9). Subsequently, in 2007 and 2011, Mr. Friesen released several thousand pages of documents related to multiple litigations (Pl.'s Opp., Ex. 11–12), but continued to assert attorney-client privilege (Defs.' Mot., Ex. P) over at least 284 documents in whole or in part, as noted in two privilege logs that Mr. Friesen produced (Defs.' Mot., Ex. D–E). We set forth below background facts relevant to the assertion of attorney-client privilege in this case.

The documents sought here relate to Mr. Friesen's '550 application for an invention, the "User Interface for an Electronic Trading System," which he developed before co-founding ePit, Inc./ePit Systems in 1998 (Pl.'s Opp., Ex. 6). After he co-founded ePit, Mr. Friesen assigned the '550 application to ePit in May 1999 (Defs.' Mot., Ex. C). The '550 application generated patents currently owned by Trading Technologies, Inc. ("TTI"), among them U.S. Patent Nos. 7,212,999 and 7,533,056 (Pl.'s Opp. at 2). In making the assignment, Mr. Friesen gave to ePit "[t]he entire worldwide right, title, and interest in and to" the patent, as well as "all oaths, assignments, powers of attorney, applications, and other papers necessary or desirable to fully secure" the rights, titles, and interests that he was conveying to ePit (Defs.' Mot., Ex. C). Mr. Friesen also agreed not to make any "assignment, grant, mortgage, license, or other agreement affecting the rights, titles, and interests" conveyed in the agreement (*Id.*).

On Oct. 21, 2002, ePit assigned the '550 application and three others to Hitachi, Ltd. (Defs.' Mot., Ex. H). Mr. Friesen had been terminated from ePit before the assignment took place (Defs.' Mot., Ex. G at 246:24–247:5). The assignment agreement between ePit and Hitachi contained language to that similar in Mr. Friesen's assignment of the same patent application to ePit, including the transfer of "[t]he entire worldwide right, title, and interest" in the '550 application (Defs.' Mot., Ex. H). Additionally, ePit specifically assigned to Hitachi the right "to sue in its own name" to recover on any rights or infringement of the patent (*Id.*). Shortly thereafter, in late 2002, ePit ceased operations (Defs.' Mot., Ex. J).

The agreement between ePit and Hitachi made no mention of the assignment or transfer of the attorney-client or any other privilege. Moreover, possession of the documents at issue in this motion was not given to Hitachi.

Hitachi subsequently assigned the '550 application to TTI just over a year later (Pl.'s Opp., Ex. 8). The transfer between Hitachi and TTI awarded TTI "the entire right, title and interest in said invention or improvements and to have the right to make this assignment" (Defs.' Mot., Ex. K). As with the agreement between ePit and Hitachi, the agreement between Hitachi and TTI made no mention of an assignment or transfer of the attorney-client privilege, or of any privilege whatsoever. And, possession of the documents was not given to TTI as part of the assignment. At the time of those transfers, and to this day, copies of the documents defendants are seeking in this motion have been stored on data CDs stored on a bookshelf in Mr. Friesen's home, though he sent the documents to his attorney as well (Pl.'s Opp., Ex. 2 at 15:6–23).

## II.

Courts allow parties to assert the attorney-client privilege "to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). In general, the party asserting the privilege has the burden of proving that it should apply to any given attorney-client communication. *Valero Energy Corp. v. United States*, 569 F.3d 626, 630 (7th Cir. 2009). Because the attorney-client privilege "is in derogation of the search for the truth," however, it "must be strictly confined." *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000).

"[T]he disclosure policies of the patent laws do not preclude the proper application of the attorney-client privilege and work product doctrine." *Natta v. Zletz*, 418 F.2d 633, 636 (7th Cir. 1969). The Federal Circuit recently has observed that a "district court's refusal to protect the communications at issue . . . under the attorney-client privilege does not raise an issue unique to patent law." *In re Google Inc.*, No. 106, 2012 WL 371913, at *2 (Fed. Cir. Feb. 6, 2012). Instead, federal courts deciding attorney-client privilege issues should look to the law of the circuit in which they sit. *Id.* In the Seventh Circuit, "[t]he attorney-client privilege protects communications made in confidence by a client and a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice." *Sandra T.E. v. So. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). The inquiry asks "(1) whether 'legal advice of any kind [was] sought . . . from a professional legal adviser in his capacity as such'; and (2) whether the communication was 'relat[ed] to that purpose' and 'made in confidence . . . by the client.'" *Id.* (quoting *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997).

The scenario at issue here presents an unusual framework for the assertion of attorney-client privilege. Mr. Friesen claims attorney-privilege in these documents concerning a patent application he assigned to ePit, a corporation which is now defunct. And TTI, the current assignee of that patent application, claims that it also has an attorney-privilege in those same documents despite never actually possessing them.

TTI asserts several rationales for the claim of privilege. *First*, TTI argues that Mr. Friesen retains a personal privilege to the documents in question, on the ground that he was an implied joint client of the attorneys for ePit and thus enjoyed the privilege as related to his work for ePit (Pl.'s Opp. at 8-9). *Second*, TTI argues that the attorney-client privilege was conveyed along with the various assignments of the patent application, meaning that it traveled from Mr. Friesen to ePit to Hitachi to TTI (*Id.* at 10). In other words, TTI claims both that Mr. Friesen transferred the privilege regarding his patent application to ePit (which then transferred it to Hitachi, which transferred it to TTI), but also that Mr. Friesen and ePit were one and the same for purposes of legal advice. The uneasy relationship between these two arguments underlines the faults within each of them individually.

### A.

Plaintiff argues first that Mr. Friesen was in effect a joint client of his attorneys along with ePit during his employment at the company. Plaintiff contends that the advice ePit obtained from its attorneys "was ultimately personal to Mr. Friesen," as he was an inventor on the '550 application, producing an "implied attorney-client relationship" between ePit's attorneys and Mr. Friesen (Pl.'s Opp. at 7-8). Because ePit was a closely-held corporation, and Mr. Friesen owned more than 35

5

percent of its stock, plaintiff claims that Mr. Friesen's rights "were synonymous to that of the ePit corporation itself" (*Id.* at 7).

TTI has offered no evidence to show why this Court should disregard the corporate form of ePit and assign the privilege to Mr. Friesen personally. With a handful of exceptions we discuss below, the documents at issue were generated both after Mr. Friesen assigned the '550 application to ePit and after he became an officer of that corporation. While Mr. Friesen's interests during that time period may have been synonymous with those of ePit, that state of affairs ceased once he left ePit. The attorney-client privilege "is controlled, outside of bankruptcy, by a corporation's management." *Commodity Futures Trading Comm'n. v. Weintraub*, 471 U.S. 343, 351 (1985). "Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties." *Id.* at 349. Mr. Friesen's claim of privilege contravenes the principle that "once [an] agent leaves the corporation's employ, the privilege, and the legal rights associated with it, do not leave with this agent. Rather, the privilege remains with the corporation, because it belongs to the corporation." *Dexia Credit Local v. Rogan*, 231 F.R.D. 268, 277 (N.D. Ill. 2004). Thus, any privilege in the documents at issue remained with ePit after Mr. Friesen's departure; the privilege did not travel with him.

Moreover, ePit itself may not assert the privilege because ePit no longer exists, and indeed has not existed for nearly a decade. A company that has ceased normal business operations but is still going through the windup process, which can involve pursuing claims, is not "dead" for purposes of the privilege. *Official Comm. of Admin. Claimants ex rel. LTV Steel Co., Inc. v. Moran*,

6

802 F. Supp. 2d 947, 949 (N.D. Ill. 2011). However, a "completely defunct company should not be allowed to assert privilege, regardless of whether it has technically maintained its legal status." *Id.*

When the corporation is gone, so too is its interest in protecting its communications; the need to promote full and frank exchanges between an attorney and agents of his corporate clients disappears when the corporation employing those clients has departed. *See, e.g., TAS Distrib. Co. v. Cummins Inc.*, No. 07-1141, 2009 WL 3255297, at *2 (C.D. Ill. Oct. 7, 2009) (unless the party invoking the privilege can point to "some compelling reason to the contrary, the attorney client privilege does not survive the death of the corporation"); *City of Rialto v. Dep't of Def.*, 492 F. Supp. 2d 1193, 1200-01 (C.D. Cal. 2007) (finding that the need for full disclosure outweighs the dissolved corporation's need to protect pre-dissolution communications); *Gilliland v. Geramita*, No. 2:05-CV-01059, 2006 WL 2642525, at *3 (W.D. Pa. Sept. 14, 2006) (disallowing privilege when there were "no current management personnel who can now assert the attorney-client privilege on behalf of the corporation"); *Lewis v. United States*, No. 02-2958 B/AN, 2004 WL 3203121, at *4 (W.D. Tenn. Dec. 7, 2004) (allowing no privilege when a "company is bankrupt and has no assets, liabilities, directors, shareholders, or employees"). ePit has undoubtedly ceased to exist, and so too has any privilege it might have been able to assert in the documents in issue.

**B.**

Plaintiff further contends that even if Mr. Friesen or ePit retains no attorney-client privilege over the documents, that privilege transferred from ePit (before it dissolved) to Hitachi along with the '550 application – and then again to the TTI, which acquired the patent application from Hitachi (Pl.'s Opp. at 10–11). Therefore, plaintiff argues, all of the various assignors and assignees of the '550 application comprised a "community of interest" that conferred the attorney-client privilege on

all parties involved (*Id.*). TTI contends that as a result, "the assignor and assignee share a legal interest in obtaining the strongest patent possible" (*Id.* at 10).

In making this argument, TTI finds itself in the difficult position of asserting privilege over documents that it never received from Hitachi, which in turn never received them from ePit. As the plaintiff's brief makes abundantly clear, the documents never left Mr. Friesen's bookshelf. Nor is there any indication whatsoever in the record that either plaintiff, or Hitachi before it, ever accessed any of the documents in the course of doing business. As a logical matter, we find it unlikely that the allegedly privileged documents were so important that they were part of the assignment, and yet (1) the assignment agreements do not state that privileged materials were part of the transfer, and (2) the documents themselves were never transferred to Hitachi (or to TTI) in any form, whether physical or electronic.

This case does not present a situation in which "two or more persons jointly consult an attorney concerning a mutual concern," as is typically the case under the common interest doctrine of the privilege. *Ohio-Sealy Mattress Mfg. Co. v. Kaplan*, 90 F.R.D. 21, 29 (N.D. Ill. 1980). The cases plaintiff cites for its community of interest theory highlight this point. In one, *In re the Regents of the University of California*, 101 F.3d. 1386, 1390 (Fed. Cir. 1996), the court found that the attorney-client privilege transferred between parties involved in a patent licensing agreement. However, in that case, the attorneys for the party acquiring license rights to the patent "advised and consulted frequently" with counsel for the party developing the patent, lending credence to the finding that the two parties shared a "common legal interest." *Id.* The record contains no indication that Hitachi's attorneys consulted with ePit on the '550 application, or that TTI's attorneys did so with Hitachi.

Furthermore, *Regents* addressed a situation in which the communications themselves were between licensor and licensee, *id.* at 1388–89, unlike the communications here, which related only to Mr. Friesen and ePit. Similarly, the two parties in another case cited by plaintiff, *Baxter Travenol Laboratories, Inc. v. Abbott Laboratories.*, No. 84 C 5103, 1987 WL 12919, at *1 (N.D. Ill. June 19, 1987) (emphasis added), were engaged in "a *joint* program of developing patents and technology relating to peritoneal dialysis." Here, there is no evidence in the record that Hitachi worked with ePit to develop the '550 application, or that Hitachi and TTI did so. To the contrary, each of the assignments (ePit to Hitachi, and then Hitachi to TTI) involved a relinquishment of, and not continuing interest in, the '550 application and the patent that spawned from it. Cases such as *Regents* and *Abbott Labs.*, in which the licensors and licensees both had simultaneous and continuing interests in the patent, are thus inapt here.

As we have pointed out, nothing in the assigning documents for the '550 application between the various parties explicitly states that any attorney-client privileged documents were part of the conveyance. That omission is significant. Courts in this district have held that a transfer of assets from one corporation to another is not sufficient for transfer of the privilege, unless there is also a transfer of overall control; "the right to assert or waive a corporation's attorney-client privilege is an incident of control of the corporation." *Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc.*, 240 F.R.D. 401, 406 (N.D. Ill. 2007). Indeed, even when the parties sign a specific agreement to transfer the privilege along with certain assets, a court may nonetheless find that the privilege did not transfer. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, No. 01 C 4366, 2003 WL 21911066, at *1 (N.D. Ill. Aug. 7, 2003) ("The court disagrees that the attorney-client privilege is a corporate asset that can be sold"). In *Zenith*, an asset purchase agreement between Zenith and another company

9

contained a clause that the sale included all privileges pertaining to the assets. *Id.* In holding against the ability of the parties to transfer privilege in such a way, the court reasoned that a contrary ruling "would allow anyone to evade waiver of the privilege, despite the transfer of privileged documents to a third party, merely by agreeing to transfer the privilege and accepting consideration for it." *Id.* at *2.

At bottom, Plaintiff's common interest argument ignores the fact "that attorneys represent *clients* – not legal positions or patents." *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 836 F.2d 1332, 1338 (Fed. Cir. 1988) (emphasis in original). Plaintiff can make no colorable claim that either Hitachi or TTI was ever a client of the same attorneys with whom Mr. Friesen communicated in relation to the '550 application. What's more, plaintiff's argument ignores that a patent is a thing, without corporeal existence. Taken to its logical extreme, plaintiff's argument would imply that the attorney-client privilege attaches to any item conveyed from one party to another so long as the transferring party once spoke to an attorney about the item. Other courts have held that it is not error for a district court to find a lack of common interest and common attorney-client privilege when the sale of a patent is not executed as "part of a joint legal claim or defense." *In re IPCom GmbH & Co.*, 428 Fed. Appx. 984, 986 (Fed. Cir. 2011). This Court sees no reason to hold otherwise.

### C.

Plaintiff observes that some of the requested communications of Mr. Friesen occurred before ePit was incorporated and before Mr. Friesen assigned the '550 application to ePit. (Pl.'s Opp. at 8). There is no evidence that transfer of the attorney-client privilege was expressly made a part of the assignment by Mr. Friesen to ePit. Thus, consistent with our analysis above, for three documents that pre-date ePit (logged as F1-F3), Mr. Friesen may assert the privilege.

In their motion, defendants challenged the assertions of privilege in these documents on the ground that "no attorney appears as an author or recipient" (Defs.' Mot. at 15). However, subsequent to the filing of their motion, the defendants and TTI agreed that they would not challenge documents falling into this category, if the log made clear that the basis for asserting privilege is that the document reference attorney-client communications reflecting legal advice. The three documents logged as F1-F3 all fall into that category and, as a result, by a letter dated January 20, 2012, defendants withdrew the portion of their motion to compel directed to those documents. We therefore deny as moot the motion to compel as to Documents F1-F3.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion to compel (doc. # 725). The motion is denied as moot as to Documents F1-F3. The motion is granted as to the remaining documents at issue in the motion. Mr. Friesen shall produce those documents (without redactions) by March 28, 2012.

ENTER:

_____
SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: March 14, 2012